## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-61833-CIV-DIMITROULEAS/ROSENBAUM

EVELYN NAZARIO,

Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

_____/

## AMENDED REPORT AND RECOMMENDATION[1]

### I. INTRODUCTION

This matter is before the Court on the cross-motions for summary judgment filed,

respectively, by Plaintiff Evelyn Nazario ("Claimant") and by Defendant Michael J. Astrue,

Commissioner of Social Security ("Commissioner"). Pursuant to 28 U.S.C. §636 and Magistrate

Rules 1(c) and (d), Local Rules of the United States District Court for the Southern District of

Florida, the Honorable William P. Dimitrouleas referred the motions. [D.E. 3].

The cross-motions present the following issues: (1) whether substantial evidence exists to

support the determination by the Administrative Law Judge ("ALJ") that Claimant retains the

residual functional capacity to engage in medium duty work, and, if so, (2) whether Claimant's past

relevant work includes work as a patient transporter as that job is defined by the *Dictionary of

Occupational Titles*, for which Claimant possesses the residual functional capacity to return. Under

---

[1] This Amended Report and Recommendation replaces the Report and Recommendation
filed on January 1, 2009 [*See* D.E. 20].

the limited standard of review that governs this case, I conclude that the ALJ erred in his decision as it relates to the second issue, but that error was harmless. Consequently, I recommend that the Court deny Plaintiff's Motion for Summary Judgment [D.E. 11] and grant Defendant's Motion for Summary Judgment [D.E. 17].

## II. PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on July 24, 2005, under Title II of the Social Security Act ("Act"), 42 U.S.C. §§401, et seq. Administrative Record ("Tr."), 41. In her application, Claimant alleged that she had been disabled since August 31, 2003, as a result of "[s]evere [b]ack [p]ain, [h]erniated [d]is[k], [high blood pressure], [h]ypertension, [m]ajor [d]epression & [a]nxiety, [c]onstant [f]atigue."[2]   Tr. 61.   Claimant met the insured status requirements of the Act and was fully insured through December 31, 2007. Tr. 17, 45.

The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. Tr. 17, 32, 36. Thereafter, on March 20, 2006, Claimant requested and was granted a hearing before an ALJ. Tr. 38, 24. On July 14, 2006, ALJ M. Dwight Evans held a hearing on Claimant's application. Tr. 249. In a decision dated September 29, 2006, Judge Evans denied Claimant's application, finding that she was not under a "disability," as defined in the Act. Tr. 23.

Claimant then requested review of the ALJ's unfavorable decision by the Appeals Council. Tr. 13. On October 19, 2007, the Appeals Council denied Claimant's request, allowing the ALJ's decision to stand as the final decision of the Commissioner. Tr. 5.

---

[2]During her hearing, Claimant sought to amend her onset date to January 15, 2004. Tr. 250. Based on the Administrative Law Judge's Decision issued on September 29, 2006 [Tr. 17], however, it appears as though the Administrative Law Judge declined to permit the amendment. See Tr. 17 referring to onset date of June 15, 2003.

On December 17, 2007, Claimant filed the Complaint in this case [D.E. 1] seeking reversal of the Commissioner's final decision. The Commissioner filed his Answer on February 28, 2008. [D.E. 8]. Thereafter, on April 21, 2008, Claimant filed her Motion for Summary Judgment. [D.E. 11]. In that Motion, Claimant alleged two errors on the part of the Commissioner:

1.  The Commissioner erred because his finding of Claimant's residual functional capacity was not supported by the evidence; and

2.  The Commissioner erred by determining that working as a patient transporter as that job is generally performed constituted past relevant work for Claimant to which she could return.

D.E. 11 at 12-20.

On July 3, 2008, the Commissioner filed his Motion for Summary Judgment and responded to Claimant's motion, arguing that no error had occurred. [D.E. 17]. Claimant chose not to file a response. This case is now ripe for consideration.

## III.  FACTS

### A.   *General Background*

Claimant was born on April 7, 1957, and was 46 years old on August 31, 2003, the time of the onset of her claimed disability. Tr. 41. Although Claimant was not working at the time of application or thereafter, she has past relevant work experience as a patient transporter, in housekeeping, and in distribution at a hospital. Tr. 75. While Claimant's level of education is not clear, she appears to have at least a tenth-grade education.[3] Tr. 251.

According to Claimant, she has been unable to work as a result of various ailments. More

---

[3]Claimant testified at her hearing that she had only a tenth-grade education. *See* Tr. 251. The Disability Report she signed, however, indicates that she graduated from high school. *See* Tr. 54.

specifically, she alleges that "pain goes up [and] down [her] back" and is "very severe." Tr. 72.

According to Claimant, "some time[s] the pain stays for days [and] days." *Id.* Claimant also alleges

that as a result of the pain, she has a hard time sleeping and suffers from major depression. Tr. 64,

48.

### B.      *Medical Evidence*

A review of Claimant's medical records reveals that Claimant has, at various times,

experienced different physical and psychological problems, such as depression, and other ailments

that the ALJ did not find rose to the level of "severe impairments." *See* Tr. 19-20. Claimant does

not challenge the ALJ's decision in this regard. Nor does Claimant suggest that such problems were

improperly ignored or minimized when the ALJ made his finding of Claimant's residual functional

capacity.

Consequently, while I have carefully considered the entire transcript, this Report and

Recommendation reviews only the medical evidence from the record relevant to Claimant's

argument that the ALJ improperly determined her residual functional capacity after finding that

Claimant suffers from the severe impairment of chronic back and neck pain, due to degenerative disk

of the cervical and lumbar spine with disk herniations. Because Claimant's argument concerning

residual functional capacity addresses her back and neck conditions only, the Court considers the

medical evidence relating to these impairments, noting that a combination of alleged impairments

can cause a "disability," even when its component parts by themselves do not.

In this case, Claimant complained that her impairment began on August 31, 2003. Prior to

that time, she worked in various capacities at hospitals in the New York area. *See* Tr. 77-82; Tr.

155-56. In explaining why she left her positions at the hospitals, Claimant stated that she stopped

working when she moved from New York to Florida. Tr. 264, 152.

The first record in the Transcript of Claimant's visit to a doctor after her date of onset is from October 8, 2003, when Claimant saw Juan P. Loy, M.D. Tr. 126. At that time, Claimant advised Dr. Loy that she had experienced headaches and discomfort in the neck area for 3 to 4 years. *Id.* Cr. Loy assessed her as suffering from migraines and prescribed Ambien. Tr. 126-27. He found all systems to be normal and intact and no sickly conditions identified on his medical notes checklist to be present. Tr. 126.

Claimant next visited Dr. Loy on November 15, 2003, when she complained of arm pain once a week and a burning sensation. Tr. 124. Again Dr. Loy concluded that she suffered from headaches. *Id.* He prescribed blood work and a stress test. *Id.* The stress test was negative except for a borderline hypertensive response, with the EKG portion reflecting a minor non-specific abnormality. Tr. 132.

During Claimant's next visit to Dr. Loy on December 15, 2003, Claimant complained of hand, neck, and back pain, including radiculopathy and irritability. Tr. 123. Based on these complaints, Dr. Loy referred Claimant for an MRI. The MRI showed (1) posterolateral disk herniations to the left at the L4-5 level, with a narrowing of the left neural foramen; (2) central subligamentous disk herniation at the L5-S1 level; (3) disk dehydration at the L4-5 and L5-S1 level; and (4) narrowing of the neural foramen with possible impingement on the respective exiting nerve roots. Tr. 133.

Apparently based on the results of this MRI, Dr. Loy referred Claimant to Andrew J. Goldberg, M.D., on January 15, 2004. Tr. 212. Dr. Goldberg noted that Claimant complained of "a relatively sudden onset of bilateral neck, shoulder and arm pain as well as bilateral lower back and

bilateral leg pain since 6/2003." *Id.* In discussing Claimant's medical history with respect to the pain, Dr. Goldberg stated, "In regard[] to treatment[,] she has not had any formal physical therapy. She received some kind of intramuscular injection by Dr. Loy which provided limited relief. She has not tried any anti-inflammatory drugs. She has not taken any opioids at this time." *Id.* Claimant, however, was taking Zyprexa to assist her sleep, which she described as "significantly interrupted because of the discomfort." *Id.*

After reviewing the MRI, Dr. Goldberg found it significant for revealing a posterolateral disk herniation to the left at L4-L5 and a disk herniation at L5-S1. *Id.* Dr. Goldberg observed Claimant to have a normal gait, as well as a normal toe and heel walk. Tr. 213. Although Dr. Goldberg found Claimant's left and right lateral flexion to be limited and to "exacerbate[] minimal discomfort," he determined that straight-leg raising, Gowers, bowstring, and Patrick's sign were all negative.[4] Tr. 214. Although Dr. Goldberg opined that Claimant's range of motion of her neck was limited to about 30 degrees, he determined her range of motion of the shoulders to be normal. *Id.* Based on his examination of Claimant, Dr. Goldberg recommended a cervical MRI, prescribed Bextra and Ultram,[5] and advised Claimant to make a follow-up appointment in three weeks. Tr. 215.

Claimant considered Dr. Goldberg to be "rude" and apparently did not return to see him, not

---

[4]The straight-leg raising test is a test for lumbosacral nerve root irritation. http://www.gpnotebook.co.uk/simplepage.cfm?ID=-1308229618. Gowers Disease is a spasmodic affection of the muscles of the lower extremities. http://cancerweb.ncl.ac.uk/cgi-bin/omd?Gowers+disease. The Bowstring test is designed to identify the presence of sciatic nerve compression. http://www.qmeval.com/Webcomponents/FAQ/index.asp?keysearch=b. Patrick's sign is a test used to determine the presence of sacroiliac disease. http://medical-dictionary.the freedictionary.com/Patrick's+sign.

[5]Bextra is the brand name for valdecoxib, a non-steroidal anti-inflammatory drug. http://www.drugs.com/mtm/bextra.html. Ultram is the brand name for tramadol, an analgesic used to treat moderate to moderately severe pain. http://www.drugs.com/cdi/ultram.html.

showing up for her February 10, 2004, appointment. Tr. 261-64, 211. Nor did she have a cervical MRI at that time. Instead, Claimant went back to Dr. Loy approximately five months later, on June 6, 2004. Tr. 122. At that appointment, Claimant continued to complain about her back. *Id.*

On June 18, 2004, Claimant again visited Dr. Loy, complaining of lower back and hand pain. Tr. 120. Dr. Loy prescribed Ambien and Ultracet.[6] Tr. 120-21.

On October 2, 2004, Claimant underwent another MRI. This time, the report showed "small disk herniations" at C3-4, C4-5, C5-6, and C6-7, impinging the subarachnoid space. Tr. 135. Additionally, the MRI reflected that at C5-6, the process was eccentric to the left of the midline, impinging the left ventral lateral margin of the chord. *Id.* Finally, the MRI showed abnormal lordosis.[7] *Id.*

Dr. Loy saw Claimant once more, on October 11, 2004, before referring her to Edward J. Frankoski, D.O. Tr. 116, 151. On October 22, 2004, Claimant visited Dr. Frankoski. Tr. 151. At that time, Claimant described her pain as rating a 10 out of 10. Tr. 151. Dr. Frankoski observed Claimant's gait to be non-antalgic and determined that the straight-leg raising test elicited no pain. Tr. 152. He further described Claimant's musculature strength in both her upper and lower extremities to be 5/5 and equal bilaterally. *Id.* As for his examination of Claimant's spine, Dr. Frankoski concluded that Claimant's cervical spine, lumbar, and thoracic spine showed no evidence of trauma, infection, or surgery, although there was some decreased range of motion secondary to

---

[6]Ambien is a sedative-hypnotic, or sleep medicine.
http://www.drugs.com/cdi/ambien.html. Ultracet is the brand name for a product containing acetaminophen and tramadol. It is used to treat moderate to severe pain.
http://www.drugs.com/mtm/ultracet.html.

[7]Lordosis is an abnormal forward curvature of the spine in the lumbar region.
http://www.thefreedictionary.com/lordosis.

discomfort of the lumbar spine. *Id.* Based on his examination of Claimant, Dr. Frankoski prescribed Flexeril and physical therapy and scheduled Claimant for epidural steroid injection s. Tr. 153.

On November 24, 2004, Dr. Frankoski performed a selective intralaminar epidural steroid injection at L5-S1, midline. Tr. 149. When Claimant next visited Dr. Frankoski, on December 10, 2004, Claimant reported that her back pain had "significantly improved" since the November 24th injection, but complained anew of left cervical pain and left arm pain. Tr. 147. Also during the December 10th visit, Dr. Frankoski performed a selective intralaminar epidural steroid injection at C4-C5 on the left side. *Id.*

Claimant next visited William W. Cheatham, D.O., who performed a consultative examination on Claimant, and observed her to have a normal gait. Tr. 197. He similarly found that Claimant was able to walk on her heels and toes and to squat. *Id.* Additionally, Dr. Cheatham performed both a seated and supine straight leg-raising test on Claimant and met with negative results. *Id.* As for Claimant's motor strength, Dr. Cheatham concluded that it was at 5/5 for both upper and lower extremities. *Id.* Dr. Cheatham likewise determined that all of Claimant's joint groups and ranges of motion were within normal limits, and her grip strength was 5/5 on both sides. Tr. 196. For example, Dr. Cheatham determined, Claimant was able to open a jar, turn a knob, pick up coins, and button and unbutton clothing with either hand. *Id.* Nor did Dr. Cheatham observe any muscle atrophy or deformity. Tr. 197. Finally, Dr. Cheatham noted that Claimant informed him that she "responded well to epidurals [in] the past." *Id.*

Returning to Dr. Frankoski, although Dr. Frankoski's notes from December 10, 2004, reflect that he expected Claimant to visit him again two weeks later for a repeat injection, Claimant apparently did not return to Dr. Frankoski until five months later, on May 20, 2005, after first seeing

Dr. Loy again on May 12, 2005. *See* Tr. 143, 114. During the May 20th appointment, Claimant advised Dr. Frankoski that she experienced improvement of her pain after the injections he performed in 2004. *Id.* Unfortunately, however, Claimant reported, the pain had started to return. *Id.* Therefore, Dr. Frankoski prescribed Ultracet, in addition to the prescription for Flexeril that she already had from Dr. Loy. Tr. 145. Additionally, Dr. Frankoski scheduled Claimant for a series of cervical and lumbar epidural steroid injections. *Id.*

Claimant had the first set of selective intralaminar epidural steroid injections on June 1, 2005. Tr. 141. She reported at her June 15, 2005, appointment with Dr. Frankoski two weeks later that she had enjoyed "marked improvement" of her pain in the cervical region. Tr. 139. As Claimant was then complaining of pain primarily in her low back and into her left leg, Dr. Frankoski performed appropriate epidural steroid injections for those areas. *Id.*

On June 24, 2005, Claimant again visited Dr. Frankoski. Tr. 136. She reported that her discomfort had "markedly improved" and described her pain during that appointment as rating a 4 out of 10. *Id.* According to Dr. Frankoski's notes, Claimant stated that she had "much better control of her pain in her low back" and "only use[d] an occasional [Ultracet] or Flexeril." *Id.* Dr. Frankoski concluded, "At this point, we are not going to give the patient any more medications. She still states that she has plenty of Ultracet as well as Flexeril at home and she uses them quite sparingly. She will return on [an as-needed] basis for a repeat injection if so indicated." Tr. 137. The Transcript contains no further record of any visits by Claimant to Dr. Frankoski.

On October 13, 2005, Claimant again visited Dr. Loy. The Court finds the notes of that visit difficult to decipher, but recognizes that they refer to epidurals and Cymbalta. Tr. 112. As for the check lists appearing on Dr. Loy's records, once again, they reflect only normal and intact systems

and the absence of sickly conditions. *Id.* During this appointment, Dr. Loy prescribed Ambien for Claimant. Tr. 113.

Claimant next visited Dr. Loy approximately four months later, on February 14, 2006. *See* Tr. 225. Dr. Loy's treatment notes indicate that the reason for the visit was to refill medications and that Claimant had no new complaints. Tr. 225. Although Claimant had an appointment again with Dr. Loy for March 14, 2006, she did not attend. Tr. 224. Instead, her next and apparently last visit to Dr. Loy occurred on May 22, 2006. While the treatment notes are difficult to decipher, that visit seems to have been primarily for purposes of addressing asthma issues. Tr. 222.

### C.   *The Hearing Before the ALJ*

The ALJ held an administrative hearing in this matter on July 14, 2006. *See* Tr. 249-68. Claimant was sworn, and she testified. Among other information, Claimant stated that she had been attending physical therapy once a week. Tr. 254. Additionally, she indicated that lower pain in her back and arms, "the throbbing, the burning sensation" keep her from being able to work. Tr. 255. According to Claimant, her left side is affected more than her right. *Id.* Although Claimant testified that she believes that a surgery can repair her disk herniations, she explained that she does not want such surgery. *Id.* When asked about epidural steroid injections Claimant has received for her back and neck pain, Claimant stated that she had two sets of two such injections. Tr. 256. Claimant described the epidural injections as "reliev[ing] [her] a little . . . [l]ike for two months." *Id.* Further, Claimant explained that she "live[s] on" pain medication, which "relieves [her] pain." Tr. 256-57. In describing the effects of her pain, Claimant testified that it interferes with her ability to sleep, and it causes her depression. Tr. 258.

When Claimant discussed the impact of her condition on her ability to engage in activities

of daily living, Claimant stated that she does not do much in the way of personal chores anymore. Tr. 259. Rather, she said, her family helps her. *Id.* According to Claimant's testimony at the hearing, Claimant's husband cooks and her children "straighten up" and vacuum. *Id.* Claimant indicated that she cannot engage in those activities because she cannot bend and she has pain and burning in her back and arms, respectively. Tr. 260. In reviewing her other physical abilities, Claimant testified that sitting becomes uncomfortable after about ten minutes, and standing becomes difficult after five or six minutes. Tr. 260-61. Nor, Claimant continued, can she bend or kneel. Tr. 261.

As for Claimant's work history, Claimant testified that she last worked in July, 2002. Tr. 252. Claimant's past work includes jobs at hospitals in the areas of (1) housekeeping, (2) patient transport, and (3) distribution. Tr. 252-53. More specifically, Claimant served with the housekeeping department of Bellevue Hospital from April, 1988, through February, 1990. Tr. 75. After that, she worked as a patient transporter for Bellevue Hospital until March, 1991, when she then took a job as a patient transporter with Kimball Hospital. *Id.* She served in that position until April, 1996. *Id.* At that time, Claimant started working for the distribution department of Kimball Hospital – a job she held until 2002. *Id.*

According to Claimant, her duties as a patient transporter required her to move patients from their beds to stretchers or to move patients to the areas where they had to go, such as for x-rays or CAT scans. Tr. 252. Claimant further described her responsibilities as a patient transporter in her Work History Report [Tr. 75]. There, she indicated that the heaviest weight she lifted was "[p]eople," and that she frequently lifted "[p]eople." Tr. 77. In the distribution department, Claimant distributed the required supplies (such as syringes, etc.) to locations of the hospital where

they were needed. Tr. 253. Claimant testified that she left her job with Kimball Hospital when she moved to Florida from New York. Tr. 264. After the move to Florida, Claimant did not return to work. *Id.*

### D. The ALJ's Decision

The ALJ rendered his decision on September 29, 2006. [Tr. 17]. In short, the ALJ determined that Claimant did not have a disability as defined under the Social Security Act and was not entitled to disability benefits. More specifically, the ALJ found that although Claimant suffers from the severe impairment of chronic back and neck pain due to degenerative disk of the cervical and lumbar spine with disk herniations, she, nonetheless, meets no listing and retains the residual functional capacity to perform medium duty work, including past relevant work as a patient transporter as that job is generally performed. *Id.* at 19-23.

### IV. STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is a limited one. *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion. *Id.* at 401, 91 S.Ct. at 1427; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. The scope of review is limited to an examination of the record only. *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th

Cir. 1983). If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision, "even if the proof preponderates against it." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)). In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## V. ANALYSIS

### A. *The Sequential Evaluation and Its Application by the ALJ*

Initially, a claimant has the burden of establishing that she is disabled under the Social Security Act. *Walden*, 672 F.2d at 838; *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history. *Walden*, 672 F.2d at 839.

*Step One*. To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520. This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity. 20

C.F.R. § 404.1520(b). If so, a finding of "no disability" is made. If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ determined that Claimant met the disability insured status requirements of the Social Security Act on June 5, 2003, the alleged onset date, and is insured for disability benefits through December 31, 2007. Tr. 17. The ALJ then applied the facts, as he found them, to the sequential evaluation framework. At Step One, he found that Claimant has not engaged in substantial gainful activity from the date of onset. Tr. 19.

*Step Two.* At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ will proceed to the next phase of the analysis. *Id.* Here, the ALJ found that Claimant suffered from the severe impairment of chronic back and neck pain, due to degenerative disk of the cervical and lumbar spine with disk herniations. Tr. 19.

*Step Three.* The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations. 20 C.F.R. § 404.1520(d). Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational background. *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987).

If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii) & (d). If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart B, Appendix 1. Tr. 20-21. Accordingly, to find Claimant disabled, the ALJ needed to proceed to the next step in the analysis.

*Step Four.* This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony, and the observations of others. *Id.* The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work. If so, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity. Tr. 21-22. In making this assessment, the ALJ considered Claimant's subjective complaints, as well as the medical documentation of record. *Id*. After evaluating this information, the ALJ concluded that "[C]laimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but . . . [C]laimant's statements concerning the intensity, persistence and

-15-

limiting effects of these symptoms are not entirely credible . . . ." Tr. 21. The ALJ also carefully considered all of the medical opinions in the record regarding the severity of Claimant's impairments and found that the opinion of Dr. Loy, Claimant's treating physician, was "not supported by the record or by the paucity of his records." *Id.* at 22. Consequently, the ALJ accorded Dr. Loy's opinion little weight. *Id.*

Based on his evaluation of the evidence of record, the ALJ determined that Claimant is capable of performing past relevant work as a hospital patient transporter, as generally performed. Tr. 22. In so finding, the ALJ referred specifically to Social Security Ruling 82-62 (D.E. 1982), which directs that the residual functional capacity to meet the physical and mental demands of jobs that a claimant has performed in the past, "either the specific job a claimant has performed or the same kind of work <u>as it is customarily performed throughout the economy</u>, is generally a sufficient basis for a finding of 'not disabled.' The claimant must show the inability to do the type of work performed in the past, not merely the specific job he or she held." *Id.* (emphasis in original) (citing *Jackson v. Bowen*, 801 F.2d 1291 (11th Cir. 1986)).

*Step Five.* Where, as in this case, the ALJ concludes that a claimant is capable of performing past relevant work, the analysis ends there. If, on the other hand, the ALJ had determined that Claimant could not perform her past relevant work, the burden then would have shifted to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to the claimant to prove an inability to perform those jobs. *Id.* These shifting burdens comprise the fifth and final step, at which point

the ALJ must resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(f). Essentially, the ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled. Because the ALJ in the case under review determined that Claimant retains the residual functional capacity to perform past relevant work, however, the ALJ did not reach the fifth step of the sequential analysis.

**B.**      **_Whether Substantial Evidence Supports the ALJ's Decision_**

As discussed above, Claimant alleges two separate errors in the ALJ's decision:  (1) the Commissioner erred because his finding of Claimant's residual functional capacity was not supported by the evidence; and (2)  the Commissioner erred by determining that Claimant's past relevant work included work as a hospital patient transporter as that job is described in the *Dictionary of Occupational Titles*. The Court considers each objection in turn.

**_1._**      **_Claimant's Residual Functional Capacity_**

Essentially, Claimant argues that the ALJ's finding that Claimant has the residual functional capacity to perform medium duty work is not supported by substantial evidence. More specifically, Claimant complains that the ALJ erred by according little weight to a physical capacity assessment opinion from Dr. Loy, Claimant's treating physician, and instead allotting "great weight" to the opinion of the non-examining state agency physician. D.E. 11 at 12-18. After a careful review of the record, I find no error.

In considering Claimant's objections to the ALJ's decision in these regards, the Court keeps

in mind the fact that "[i]t is well established that 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).  Among other good cause, a treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or it is wholly conclusory. *Id.* (citing *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991)).  Similarly, where a treating physician's report is contradicted by his own treatment notes, an ALJ has good cause to reject the report.  *See Edwards v. Sullivan*, 937 F.2d at 584.

Turning to Dr. Loy's Medical Assessment of Ability to Do Work-related Activities (Physical) prepared on June 15, 2006, *see* Tr. 235, the Court observes first that Dr. Loy indicated little in the way of support for his conclusions on the face of the form itself.  In this regard, Dr. Loy made no comments regarding how or why he determined that Claimant can lift only less than five pounds, for less than 1/3 of an 8-hour day. *See* Tr. 235.  As for standing and walking ability, Dr. Loy supported his conclusions that Claimant can stand or walk a total of one to two hours in an eight-hour day by writing, "lower back pain" and another one-word comment that I cannot decipher.  With regard to environmental restrictions that Dr. Loy found applicable to Claimant, Dr. Loy stated in support of his determinations that Claimant cannot move machinery because of what appears to read, "back pain," that temperature extremes, chemicals, and dust affect Claimant's asthma, and that noise causes claimant what appears to be "irritability." Tr. 237.  Other than these remarks, Dr. Loy's Medical Assessment of Claimant is entirely devoid of explanation for his conclusions.  As for the comments that do appear, as recited above, they are conclusory and fail to elucidate why Dr. Loy reached the determinations he did with respect to Claimant's physical condition.

Nor does Dr. Loy's Medical Assessment of Claimant appear to be consistent with his treatment notes. Dr. Loy's treatment notes reflect that he saw Claimant twelve times from October, 2003, through May, 2006. Tr. 126, 124, 123, 122, 120, 118, 116, 114, 154, 112, 225, and 222. During this time, although Dr. Loy's notes show that Claimant complained of neck, hand, and back pain, and Dr. Loy prescribed various medications for her to address the pain and to help her sleep, Dr. Loy, nonetheless, always indicated in his treatment notes that all systems he checked were "normal" or "intact," as appropriate, and that all sickly conditions indicated on his checklists were "absent." While Claimant underwent MRIs in December, 2003, and October, 2004, which indicated central disk herniations present at C3-4, C4-5, C5-6, and C6-7, as well as a minimal bulge at C2-3, he referred Claimant to Edward J. Frankoski, D.O, to address the problems.

Dr. Frankoski's notes, in turn, show that he enjoyed noteworthy success in relieving Claimant's pain. On November 24, 2005, Dr. Frankoski gave Claimant an epidural steroid injection at L5-S1, midline. Tr. 149. Claimant returned to Dr. Frankoski on December 10, 2004. Tr. 147. At that time, Claimant advised Dr. Frankoski that her low back pain had "significantly improved." *Id.* Because Claimant then complained of left cervical pain and left arm pain, Dr. Frankoski performed an epidural steroid injection at C4-C5 on the left side. *Id.*

The next record of a visit by Claimant to Dr. Frankoski is from five months later, on May 20, 2005. *See* Tr. 143. In Dr. Frankoski's notes of that visit, Dr. Frankoski stated that he had last seen Claimant in December, 2004. *Id.* Although Claimant advised Dr. Frankoski that she experienced improvement of her pain after the epidural steroid injection in December, she stated that her pain had started to return. *Id.* Consequently, Dr. Frankoski scheduled Claimant for additional injections. Tr. 145.

-19-

On June 1, 2005, Claimant underwent another cervical injection. Tr. 141. She next visited Dr. Frankoski on June 15, 2005. Tr. 139. At that time, Claimant stated that she had "marked improvement" of her pain in the cervical region as a result of the June 1st injection. *Id.* As Claimant then complained of lower back pain, Dr. Frankoski gave Claimant injections at the L3-L4, L4-L5, L5-S1, left side, levels. Tr. 140.

Claimant returned to Dr. Frankoski on June 24, 2005. Tr. 136. She reported that her discomfort "markedly improved" and rated her pain on that day as a 4 out of 10. *Id.* According to Dr. Frankoski's notes, Claimant stated that she had "much better control of her pain in her low back" and needed to use only "an occasional [Ultracet] or Flexeril." *Id.* Other than that, Claimant said, she was "doing well." *Id.* Dr. Frankoski decided that he was "not going to give the patient any more medications. She still states that she has plenty of Ultracet as well as Flexeril at home and she uses them quite sparingly." Tr. 137. Thus, Dr. Frankoski concluded that Claimant would return to see him on an as-needed basis for "a repeat injection if so indicated." *Id.* The Transcript lacks any record of any further visits by Claimant to Dr. Frankoski.

Although Claimant visited Dr. Loy twice after the last appointment with Dr. Frankoski, Dr. Loy's treatment notes from the first such visit, which occurred on February 14, 2006, indicate that Claimant visited Dr. Loy for a refill of her medications, but that she had "no new complaints." Tr. 225. Once again, Dr. Loy checked off all systems as normal and intact. *Id.* During Claimant's May 22, 2006, visit to Dr. Loy, Claimant appears to have visited him primarily for asthma problems. Tr. 222. Thus, a review of Dr. Loy's own records, as well as of those of Dr. Frankoski, to whom Dr. Loy referred Claimant to address Claimant's lower back and neck pain, demonstrates that Dr. Loy's Medical Assessment of Claimant's limitations in light of her back and neck conditions is

inconsistent with his treatment notes. Consequently, in view of this fact and the conclusory nature of Dr. Loy's Medical Assessment, the ALJ did not err in according Dr. Loy's Medical Assessment little weight.

Moreover, upon review of the record, while it is clear that Claimant does, in fact, suffer from the severe impairment of chronic back and neck pain, due to degenerative disk disease of the cervical and lumbar spine with disk herniations, as specifically concluded by the ALJ, Tr. 19, substantial evidence, nonetheless, supports the ALJ's determination that Claimant still possesses the residual functional capacity to perform medium duty work. First, as described above, Claimant herself advised Dr. Frankoski that she enjoyed marked improvement in her conditions as a result of the injections that he gave her. Moreover, the fact that Dr. Frankoski advised Claimant in June, 2005, that she could return for additional injections on an as-needed basis, yet Claimant apparently never went back, despite acknowledging the relief provided by the injections, indicates that while Claimant may well have continued to experience discomfort, such discomfort was not bothering her enough to obtain relief that she knew to be available.

Second, William W. Cheatham, D.O., who performed a consultative examination on Claimant, observed her to have a normal gait. Tr. 197. He similarly found that Claimant is able to walk on her heels and toes and to squat. *Id.* Additionally, Dr. Cheatham performed both a seated and supine straight leg-raising test on Claimant and met with negative results. *Id.* As for Claimant's motor strength, Dr. Cheatham concluded that it was at 5/5 for both upper and lower extremities. *Id.* Dr. Cheatham likewise determined that all of Claimant's joint groups and ranges of motion were within normal limits, and her grip strength was 5/5 on both sides. Tr. 196. For example, Dr. Cheatham determined, Claimant was able to open a jar, turn a knob, pick up coins, and button and

-21-

unbutton clothing with either hand. *Id.* Nor did Dr. Cheatham observe any muscle atrophy or deformity. Tr. 197. Finally, Dr. Cheatham noted that Claimant informed him that she "responded well to epidurals [in] the past." *Id.*

Third, although Trueby K. Bodiford, SDM, the agency employee who prepared a physical residual functional capacity assessment on September 8, 2005, concluded that Claimant could only occasionally lift 20 pounds and frequently, 10, he further determined that Claimant was only "partially credible," finding that her reported symptoms were not supported by all medical evidence of record in the file. Tr. 178. He also opined that Claimant could stand or walk for up to six hours in an eight-hour work day, and that Claimant had an unlimited ability to push or pull.

Fourth, Gary Cater, D.O., an agency physician who prepared a residual functional capacity assessment of Claimant on February 9, 2006, determined that Claimant could occasionally lift 50 pounds and frequently, 25. Tr. 200. Dr. Cater also concluded that Claimant could walk or stand for six hours in an eight-hour work day, with an unlimited ability to push and pull. *Id.* Like Trueby K. Bodiford, Dr. Cater opined that Claimant's allegations concerning her pain were "partially credible" but were "d[i]sproportionate to the objective [medical evidence of record]." Tr. 204.

Fifth, Claimant's doctors treated her back and neck symptoms conservatively, prescribing anti-pain and other medications as necessary, and performing injections of steroids. No surgery was performed or suggested.

Sixth, the injections Claimant received provided her with significant relief. In this regard, she described "marked improvement" in her pain.

Seventh, the ALJ specifically concluded, upon listening to Claimant's testimony and reviewing the record, that although Claimant's medically determinable impairments could reasonably

-22-

be expected to produce the types of symptoms of which Claimant complained, Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were "not entirely credible." Tr. 21. In evaluating a claimant's subjective complaints, "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991). An ALJ is required to apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) evidence that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id.* (citations omitted). Thus, a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *See id.* at 1561. Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities. *Hargis*, 945 F.2d at 1489; *see also* 20 CFR §§ 404.1529 and 416.929.

Here, although the record contains evidence of the first factor, it does not contain evidence of the second or third, in view of the previously articulated facts. Moreover, with respect to Claimant's testimony, the Court notes that as the finder of fact, the ALJ has particularly wide latitude to evaluate the credibility of the testimony. *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984). Indeed, in this case, the ALJ specifically cited Claimant's demeanor during the hearing as not supporting her testimony. *See* Tr. 22. More particularly, while Claimant complained that she could

sit for only ten minutes at a time before becoming uncomfortable, Tr. 260, the ALJ observed that throughout the hearing, Claimant "did not appear to be in pain." *Id.*

Other evidence in the record similarly indicates inconsistencies. For example, in the Function Report completed August 2, 2005, Claimant checked the box indicating "no problem with personal care," elaborating only that "sometimes[s] [her] husband help[s] [her]" with dressing. Tr. 64. Claimant similarly stated in that report that while she cannot stand up long, she prepares her own meals daily. Tr. 65. In the same vein, Claimant noted that she washes clothes in the washing machine, drives, and shops once a week for "food, clothes, things I need to live" for about an hour at a time. Tr. 65-66. Similarly, during a consultative psychiatric examination performed by Luis R. Zaldivar, Ph. D., in August, 2005, Claimant told Dr. Zaldivar that she does her own activities of daily life. Tr. 155

In the Function Report prepared in December, 2005, although Claimant did not check the box indicating "no problem with personal care," she described the effects of her conditions only as requiring her to conduct personal care activities "slowly." Tr. 102. Again Claimant noted that she prepares food daily. Tr. 103. Additionally, Claimant stated that she "can clean some things [and] can do some laundry (light loads)." *Id.* In this Function Report, however, Claimant stated that she shops for food only and does so for 45 minutes weekly. Tr. 104.

Thus, the record is not inconsistent with the ALJ's determination that Claimant was "not entirely credible," particularly against the background of the deference owed to the ALJ who observed Claimant's demeanor during the hearing. For this reason, as well as all of the facts discussed above, while there is no question that Claimant suffers from a severe impairment, substantial evidence, nonetheless, supports the ALJ's determination that Claimant can still engage

in medium duty work.

### 2.   *Claimant's Past Relevant Work*

Claimant also takes issue with the ALJ's finding that Claimant's past relevant work experience as a transporter at a hospital constituted work as a "Transporter, Patients," under the *Dictionary of Occupational Titles*, Vol. 1 (4th Ed. 1991) ("*DOT*"), 355.677-014, and, thus, constituted medium duty, and his subsequent determination that Claimant could "return" to that work. According to Claimant, her work as a hospital transporter required her to move patients from their beds to stretchers and then to move them from stretchers to the places they needed to go. D.E. 11 at 18. Consequently, Claimant asserts, her actual duties involved lifting people, work that demanded that Claimant lift more than 50 or 100 pounds. *Id.* Such lifting requirements qualify as heavy duty, not medium duty. Hence, Claimant argues, the DOT description for "Transporter, Patients," which characterizes the position as involving medium duty and which was relied upon by the ALJ does not accurately represent Claimant's past relevant work.

Rather, Claimant suggests, her past relevant work falls under the *DOT* description of "Orderly," Code 355.674-018. The *DOT* classifies work as an "Orderly" as heavy duty. Because Claimant contends that she did not perform past relevant work as a "Transporter, Patients," as that job is described by the *DOT*, but, rather, effectively worked as an "Orderly," Claimant asserts that the ALJ's determination that she could "return" to her past relevant work as a "Transporter, Patients," as that job is generally performed, was in error. And, according to Claimant, since Claimant's past relevant work more accurately falls under the *DOT* heading of "Orderly," which constitutes heavy duty, Claimant cannot return to that job because the ALJ found her to be limited to engaging in medium duty work. Thus, Claimant urges, the ALJ's decision must be reversed.

In considering Claimant's argument, the Court begins with the definition of "past relevant

work." "Past relevant work is work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §404.1560(b)(1). Determining whether a claimant can return to her past relevant work, in light of her residual functional capacity, "requires careful consideration of the interaction of the limiting effects of the person's impairment(s) and the physical and mental demands of . . . her [past relevant work] to determine whether the individual can still do that work." S.S.R. 82-61, 1982 WL 31386, *2.

The SSA has directed, "The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." *Id.* at *3. Assessing a claimant's ability to participate in past relevant work

> requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for . . . her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles,* etc., on the requirements of the work as generally performed in the economy.

*Id.* Because the decision regarding whether a claimant retains the functional capacity to perform past work that has current relevance has "far-reaching implications," it must be "developed and explained fully in the disability decision." *Id.; see also Parsons v. Apfel*, 101 F. Supp.2d 357, 363 (D. Md. 2000) ("The lack of discussion concerning [the claimant's] past relevant work in conjunction with the ALJ's vague reference to the [*DOT*] . . . fails to provide a basis for [the claimant] to challenge the ALJ's finding that he could perform his past relevant work. . . . '[I]t is manifestly unfair for the

ALJ to rely on assumptions and "facts" which the claimant cannot, without reading the ALJ's mind, test or rebut'") (quoting *Wilson v. Califano*, 617 F.2d 1050, 1054 (4th Cir. 1980)).  Indeed, the SSA has warned,

> [E]very effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.  Sufficient documentation will be obtained to support the decision.  Any case requiring consideration of [past relevant work] will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).

*Id.*  In further elaborating upon the type of information that must be taken into account in determining whether a claimant may return to her past relevant work, the SSA noted that "[d]etailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate."  *Id.*  Moreover, "[i]f more than one job was performed during the 15-year period, separate descriptions of each job will be secured."  *Id.*

Nor does the fact that a claimant will be found to be "not disabled" if either she retains the residual functional capacity to perform the actual duties of a particular past relevant job or to engage in the functional demands and actual duties of the "occupation as generally required by employers throughout the national economy," S.S.R. 82-61, 1982 WL 31387, *2; *see also Jackson v. Bowen*, 801 F.2d 1291, 1293-94 (11th Cir. 1986), relieve an ALJ of the obligation to inquire into the specific nature of the responsibilities and demands of a claimant's job as she actually performed it.  Indeed, without doing so, an ALJ cannot accurately identify a claimant's job as it is generally performed in the national economy.  When an ALJ misidentifies a claimant's past relevant work and defines her past relevant work with a description of a job in which she never actually engaged, he effectively proceeds to step five in the sequential analysis.  As discussed previously, the step five analysis

-28-

inquires into whether, based on the claimant's abilities and residual functional capacity, the claimant can engage in substantial gainful employment that exists in the national economy, in occupations other than those claimant performed in her past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). Unlike the step four analysis, the burden at step five shifts to the Commissioner, and the ALJ must rely upon a vocational expert to conclude that such work does, in fact, exist. *Id.* at 1230. In view of the significant difference between the analysis at steps four and five of the framework, it is extremely important that the ALJ limit his step-four analysis to only those jobs, whether as actually performed or as generally performed, that the claimant has, in fact, done.

Several courts have discussed the application of these principles to the determination of whether an applicant has the residual functional capacity to return to her past relevant work. In *DeLoatche v. Heckler*, 715 F.2d 148 (4th Cir. 1983), the claimant's prior relevant work included serving as a school social worker. Based on the unrebutted testimony of the claimant, her job required her to stand and walk an average of three hours a day, to drive "considerable" amounts among the fifteen schools for which she was responsible and the students' homes, to engage in frequent bending and reaching, and some carrying of materials, including typewriters, occasionally. After concluding that the claimant remained able to engage in sedentary work, the ALJ, "[w]ithout any explanation or discussion," and without indicating any reason for disbelieving the claimant's testimony in this regard, characterized the claimant's past relevant work as a social worker as sedentary and, therefore, held that the claimant was not disabled because she could return to her prior job. *Id.* at 150.

The Fourth Circuit remanded the case. In reaching this decision, the court reasoned,

> The fact that the claimant's former employer labeled the claimant's

-29-

job that of a "school social worker" does not prove that the claimant was engaged in the occupation the [*DOT*], or some other administrative categorization system, labels as "school social worker" and identifies as sedentary. The claimant may overcome the presumption that the Secretary's generalization applies by demonstrating that her duties were not those envisaged by the framers of the Secretary's category. [The claimant] appears to have met this burden. The definition of "school social worker" on which the Secretary relies makes no mention of the extensive walking, standing and driving activities required of a person responsible, as [the claimant] was, for fifteen schools. On remand, the Secretary of course may consider additional evidence on the proper characterization of [the claimant's] relevant prior work; it may be possible that the Secretary can demonstrate that it is only [the claimant's] specific prior job, and not her occupation, which is not properly termed "sedentary." However, on the present record such a determination cannot be upheld. . . . The record before us does not permit meaningful review of the Secretary's determination.

715 F.2d at 151. In other words, while the claimant's past relevant work, as generally performed, may have included that of a "school social worker" as defined by the *DOT*, the ALJ never engaged in any evaluation of the claimant's testimony or the *DOT* definition to determine whether that was, in fact, the case. As a result of the inconsistency between the claimant's testimony regarding the physical demands of her actual job and the *DOT*'s characterization of the position of "school social worker" as sedentary, the ALJ was then obligated to explain (1) whether he rejected any portion of the claimant's testimony; (2) if so, why, and (3) why the claimant's past relevant work could still fairly be characterized as that of a "school social worker" under the *DOT*, and thus, sedentary, in light of the apparent conflict between the claimant's description of her job and the *DOT*'s description of the job upon which the ALJ relied in determining whether the claimant could return to her work as her job was generally performed in the national economy.

Numerous courts have adopted the *DeLoatche* approach. In *Villa v. Heckler*, 797 F.2d 794

(9th Cir. 1986), for example, the claimant was a cook in a labor camp. The evidence indicated that the claimant's specific job required him to lift or carry large pots and sacks of food that weighed over 50 pounds. In fact, the claimant submitted medical reports showing that he had sustained injuries during his work from lifting a 60-pound pot of rice and a 100-pound sack of beans. The Appeals Council characterized the claimant's job as "cook, any industry," as that position is defined in the *DOT*. That job was described by the *DOT* as requiring medium exertional demands. In view of the ALJ's earlier determination that the claimant possessed the residual functional capacity to engage in medium exertion, the Appeals Council rejected the claimant's appeal of the ALJ's decision finding him not to have a disability since he could return to his position as a "cook, any industry."

The Ninth Circuit remanded. Citing *DeLoatche* and other cases, the court first recognized that the claimant bears the burden of proving an inability to return to his former type of work and not just to his former job. 797 F.2d at 798. Once a claimant provides information concerning past relevant work, the Commissioner "may rely on the general job categories of the [*DOT*], with its supplementary *Selected Characteristics*, as presumptively applicable to a claimant's prior work." *Id.* (citing 20 C.F.R. §404.1566(d)(1) (1986); *Gray v. Heckler*, 760 F.2d 369, 372 (1st Cir. 1985) (*per curiam*); *DeLoatche*, 715 F.2d at 151). Nevertheless, the Ninth Circuit explained, "The claimant . . . may overcome the presumption that the [*DOT*'s] entry for a given job title applies to him by demonstrating that the duties in his particular line of work were not those envisaged by the drafters of the category." *Villa*, 797 F.2d at 798 (citing *DeLoatche*, 715 F.2d at 151).

In applying this framework, the Ninth Circuit stated,

> The first question in analyzing [the claimant's] argument is whether the Secretary correctly classified his occupation as that of "cook, any industry," as that position is defined in the [*DOT*]. . . . If the

> Secretary incorrectly categorized [the claimant's] occupation under the job title "cook, any industry," then "the description applicable to that category is irrelevant to the determination of the exertional capacities required in [his] former occupation. . . ."
>
> The record does not indicate whether the Appeals Council rejected [the claimant's] allegations that his specific job had required him to lift or carry large pots and sacks of food that weighed over 50 pounds, or whether it concluded that such activities would not distinguish [the claimant's] prior job from the occupation described under the heading "cook, any industry." The record thus does not contain any finding by the Appeals Council that [the claimant] failed to demonstrate that the duties of his prior job were sufficiently distinct from the duties of a "cook, any industry" as described in the [*DOT*] to constitute a different line of work. Because reliance on the [*DOT*] definition would be inappropriate if [the claimant] demonstrated that the occupation of camp cook is distinct from the occupation of "cook, any industry," the Appeals Council decision contains a "gap in its reasoning" that must be filled on remand.

*Villa*, 797 F.2d at 798-99 (citations omitted). Thus, as in *DeLoatche*, although the Ninth Circuit

recognized that the definition of "cook, any industry," might well aptly describe the claimant's past

relevant work, it remanded the case because the Secretary failed to explain (1) whether he rejected

any portion of the claimant's evidence; (2) if so, why; and (3) why "cook, any industry" fairly

described the claimant's past relevant work, in light of the fact that the claimant presented evidence

regarding his past relevant work that appeared on its face to conflict with or be inconsistent with the

*DOT*'s description of "cook, any industry," the definition that the Secretary had chosen to describe

the claimant's prior work.

Similarly, in *Lohse v. Shalala*, 1994 WL 263699 (10th Cir. June 16, 1994),[8] the claimant in

his disability report indicated that he had worked previously as a bank security guard, a deputy

sheriff, and a security guard/patrolman. At the hearing before the ALJ, although the claimant was

---

[8]While this is an unpublished decision, it is, nonetheless, instructive.

represented by counsel, the claimant did not discuss the specific requirements of his past relevant work, and the ALJ did not inquire into the matter. Relying on S.S.R. 82-62, the Tenth Circuit concluded that this omission constituted error. According to the Tenth Circuit, "Even when a claimant is represented at the hearing by counsel, . . . the ALJ has a duty to develop the record sufficiently to make findings concerning the claimant's residual functional capacity, the physical and mental requirements of the claimant's past relevant work, and the claimant's ability to return to that past relevant work given his or her residual functional capacity." *Id.* at *3. In further explaining this requirement, the court noted,

> When the ALJ relies on a job description in the [*DOT*] . . . to determine how that job is usually performed in the national economy, . . . the ALJ must develop the record concerning the requirements of the claimant's past relevant work sufficiently to ascertain what job listing in the [*DOT*] matches the claimant's past relevant work. If the vocational disability reports the claimant submits are not sufficient to match the claimant's past relevant work with a job description in the [*DOT*], then the ALJ must develop testimony from the claimant at the hearing or obtain further information from the claimant's employers.

*Id.* Thus, the court remanded the case, finding, among other errors, that the ALJ "failed to develop a clear record concerning the requirements of [the claimant's] past relevant work as he actually performed it and the requirements of that work as usually performed in the national economy. Further, the ALJ failed to relate the requirements of [the claimant's] past relevant work to his ability to perform basic work activities . . . ." *Id.* at *6. *See also May v. Bowen*, 663 F. Supp. 388 (D. Me. 1987) (where claimant described past work as "pressure jobs" in her vocational report and her impairments included conditions aggravated by pressure, ALJ was required to inquire into the physical and mental demands of her past jobs, even though claimant, who was represented by an attorney, failed to testify to such matters during her administrative hearing).

Several principles may be gleaned from these cases.[9] First, the claimant bears the burden of showing that she cannot return to both her prior actual job and her prior type of work as that work is generally performed in the national economy. Second, an ALJ may consider job descriptions found in the *DOT* when determining whether a claimant may return to her prior type of work as that work is generally performed in the national economy. Third, in determining which *DOT* job descriptions to consider, the ALJ must take into account the actual physical and mental demands of the claimant's past relevant work. Fourth, if the ALJ chooses a *DOT* job description that does not appear to match the claimant's actual job based on the evidence of record, the ALJ must state whether he is rejecting or finding not to be determinative any portion of the claimant's evidence

---

[9]Other courts have likewise reached the same conclusions with regard to other claimants. *See, e.g., Parsons v. Apfel*, 101 F.Supp.2d 357 (D. Md. 2000) (error for ALJ to rely upon *DOT* description of "consultant," when uncontradicted testimony in record did not appear on its face to meet the *DOT* definition and ALJ did not explain what he considered to be the pertinent duties of the claimant's past relevant work); *Davis v. Apfel*, 990 F. Supp. 1152 (W.D. Mo. 1997) (error for ALJ to rely upon *DOT* description of "cashier at a casino" when uncontradicted record indicated that "the job of casino cashier as described in the [*DOT*] [was] not the same job [the claimant] had performed in Las Vegas," and ALJ never made a finding that the claimant's description of her work as a casino cashier was not credible; error for ALJ to rely upon *DOT* description of "cashier-checker" when *DOT* description did not appear to match the claimant's description of her past relevant work and ALJ "did not discuss how or why he selected the position of cashier-checker as being substantially similar to [the claimant's] past work. He simply plucked the position description from the [*DOT*] and assumed it involved the same type of work as that which [the claimant] performed as a cashier in a convenience store without accounting for the vast, material differences between the two descriptions."); *see also Betancourt v. Sullivan*, 1990 WL 124502 (9th Cir. Aug. 24, 1990) (error for ALJ to apply *DOT* job description when considering whether the claimant could return to his past relevant work as generally performed, where the claimant's testimony could be construed as rebutting the applicability of the particular *DOT* category selected by the ALJ, there was no evidence in the record to indicate whether the ALJ considered or rejected the claimant's testimony regarding his prior job duties, nothing in the record indicated why the ALJ chose the *DOT* job description he did, and the record did not show that the ALJ determined that the claimant's description of his actual job duties would not distinguish his position from the *DOT* description relied upon by the ALJ); *Simmons v. Chater*, 1995 WL 674606 (4th Cir. Nov. 14, 1995) (remanding because ALJ failed to consider whether the claimant rebutted the *DOT*'s definition of her prior relevant work).

regarding her actual work duties.  Fifth, if so, the ALJ must explain why he does not find the

claimant's evidence to be credible or determinative of the job description applying to the claimant's

work as it is generally performed in the national economy.  Sixth, in such a situation, the ALJ must

explain why he has selected the particular *DOT* job description upon which he relies.  Finally, the

ALJ must discuss why the claimant's impairments do not prevent the claimant from returning to

prior relevant work the way that work is generally performed (as described in the *DOT* if the ALJ

chooses to rely upon that).

Having discussed the framework for review of the ALJ's decision with respect to step four

of the sequential analysis, the Court now turns to the ALJ's decision in this case regarding whether

Claimant's residual functional capacity as determined by the ALJ renders her capable of performing

her past relevant work.  In this regard, the ALJ concluded,

> **6. The claimant is capable of performing past relevant work as
> hospital patient transporter. This work does not require the
> performance of work-related activities precluded by the
> claimant's residual functional capacity (20 CFR 404.1565).**
>
> The claimant has past relevant work as a hospital patient transporter.
> According to [the *DOT*], hospital patient transporter is unskilled work
> requiring medium exertion (DOT No. 355.677-014).
>
> In comparing the claimant's residual functional capacity with the
> physical and mental demands of this work, the undersigned finds that
> the claimant is able to perform it as generally performed.
>
> [SSR 82-62] directs that the residual functional capacity to meet the
> physical and mental demands of jobs that a claimant has performed
> in the past, either the specific job a claimant has performed or the
> same kind of work *as it is customarily performed throughout the
> economy*, is generally a sufficient basis for a finding of "not
> disabled." The claimant must show the inability to do the type of
> work performed in the past, not merely the specific job he or she held.
> *Jackson v. Bowen*, 801 F.2d 1291 (11th Cir. 1986).

Tr. 21. (emphasis in original). Review of the ALJ's decision reveals no further discussion regarding Claimant's ability to engage in past relevant work as generally performed.

To evaluate whether this aspect of the ALJ's decision complies with the principles previously discussed, the Court turns to the evidence of record concerning Claimant's past relevant work as a hospital patient transporter. Among other evidence, the record contains Claimant's work history report, in which Claimant described her work as a patient transporter as follows: "[T]ransport patients is lifting[,] pulling[,] and carrying from the[ir] bed to stretcher and to w[h]ere they have to go. [T]hat is my job all day for 8 hour." Tr. 78. She further indicated that the heaviest weight she lifted in the position was 100 pounds or more, and that she frequently lifted 50 pounds or more, including "people." *Id.* In her Disability Report [Tr. 47], Claimant responded to the question, "What did you do all day?" by stating, "Transported patients." Tr. 49. As for lifting and carrying, Claimant noted, "Assisted patients [at] times." *Id.* During the hearing, Claimant similarly explained her duties as a patient transporter as "moving patients from their bed to the stretcher, moving them to the area where they have to go, either X-ray, OR, CAT scan. . . ." Tr. 252.

With this evidence in mind, the Court reviews the *DOT*'s description of a "Transporter, Patients:"

> ### 355.677-014:  TRANSPORTER,  PATIENTS  (medical  ser.)
> **alternate titles: escort, patients**
>
> Escorts or transports patients within hospital or other medical facility: Determines patient name, destination, mode of travel, time, and other data, following written or oral instructions.  Directs or escorts incoming patients from admitting office or reception desk to designated area. Carries patient's luggage. Assists patient in walking to prevent accidents by falling, or transports nonambulatory patient, using wheelchair. Transports patient, alone or with assistance, in bed, wheeled cart, or wheelchair to designated areas within facility during

patient stay. Delivers messages, mail, medical records, and other items.
*GOE: 10.03.03 STRENGTH: M GED: R2 M1 L2 SVP: 2 DLU: 88*

As for the job of "Orderly," the *DOT* describes the position as follows:

### 355.674-018: ORDERLY (medical ser.)

Performs any combination of following tasks, as directed by nursing
and medical staff, to care for patients in hospital, nursing home, or
other medical facility: Bathes patients and gives alcohol rubs.
Measures and records intake and output of liquids, and takes and
records temperature, and pulse and respiration rate. Gives enemas.
Carries meal trays to patients and feeds patients unable to feed
themselves. Lifts patients onto and from bed, and transports patients
to other areas, such as operating and x-ray rooms, by rolling bed, or
using wheelchair or wheeled stretcher. Sets up equipment, such as
oxygen tents, portable x-ray machines, and overhead irrigation
bottles. Makes beds and collects soiled linen. Cleans rooms and
corridors. Bathes deceased patients, accompanies body to morgue,
and places personal belongings in mortuary box. Administers
catheterizations and bladder irrigations. Accompanies discharged
patients home or to other institutions.
*GOE: 10.03.02STRENGTH: H GED: R3 M2 L2 SVP: 4 DLU: 86*

Comparing the *DOT* description of "Orderly" with Claimant's statements regarding her job indicates

no evidence in the record to suggest that Claimant ever performed the position of "Orderly," as

described by the *DOT*. Indeed, nothing in the record demonstrates that Claimant ever bathed

patients; gave them alcohol rubs; measured and recorded intake and output of liquids; took and

recorded temperature, pulse, and respiration rates; gave enemas, carried meal trays to patients and

fed patients unable to feed themselves; set up equipment, such as oxygen tents, portable x-ray

machines, or overhead irrigation bottles; made beds or collected soiled linen; cleaned rooms and

corridors; bathed deceased patients; accompanied bodies to morgues; placed personal belongings in

mortuary boxes; administered catheterizations and bladder irrigations; or accompanied discharged

patients home or to other institutions. on its face, Claimant's description does not coincide fully with

the *DOT* description. Thus, the Court respectfully rejects Claimant's suggestion that the ALJ should have characterized her past relevant work as that of an "Orderly."

As for a comparison of the *DOT*'s description of "Transporter, Patients" with Claimant's statements regarding her past relevant work as a hospital patient transporter, the Court finds that the evidence in the record, for the most part, bears out the ALJ's description of Claimant's past relevant work in this way. The only apparent inconsistency between Claimant's description of her duties and the *DOT*'s description involves the intensity of the duty. Whereas Claimant's description of her past relevant work as a hospital patient transporter supports a finding that Claimant engaged in heavy duty, the *DOT* description characterizes the work as generally performed as involving medium duty.

Based on this discrepancy, however, in view of *Villa, supra*, Claimant rebutted the presumption that the Secretary's generalization of her past relevant work as a "Transporter, Patients," as defined by the *DOT*, applies. Therefore, before finding that Claimant could engage in the *DOT*-described position of "Transporter, Patients," as that work is generally performed, the ALJ should have stated whether he was rejecting or finding not to be determinative any portion of Claimant's evidence regarding her actual work duties. If so, the ALJ was required to explain why he did not find Claimant's evidence to be credible or determinative of the job description applying to Claimant's work as it is generally performed in the national economy. The ALJ then should have explained why he selected the particular *DOT* job description upon which he relied. Finally, the ALJ was required to discuss why Claimant's impairments do not prevent Claimant from returning to prior relevant work the way that work is generally performed (as described in the *DOT* if the ALJ chose to rely upon that).

The ALJ did not engage in this analysis. His failure to do so constitutes error.

In this case, however, the Court finds that any error committed by the ALJ in this regard amounts only to harmless error. Harmless error occurs when a correct application of the appropriate regulations would not contradict the ALJ's ultimate findings. *Caldwell v. Barnhart*, 261 Fed. Appx. 188, 190 (11th Cir. 2008) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)).

In reaching this conclusion, the Court assumes the credibility and acceptance of Claimant's description of her past relevant work as a hospital patient transporter. The Court further finds that based on the fact that the evidence of record supports the determination that Claimant actually performed all significant tasks described by the *DOT* description of "Transporter, Patients," the Court concludes that the ALJ applied an appropriate job description from the *DOT* in relying upon "Transporter, Patients." That Claimant may have performed some of these duties at a higher exertional level than as the tasks are generally performed does not render irrelevant the fact that Claimant actually engaged in all the central duties of a "Transporter, Patients," as that work is generally performed. It is clear that Claimant is trained in the job of a "Transporter, Patients," as that job is generally performed, and that she has, in fact, conducted the duties of that position long enough to learn to do it. As such, the ALJ fairly characterized Claimant's work under the *DOT* description of "Transporter, Patients," as "past relevant work." *See* 20 C.F.R. §404.1560(b)(1).

Nor do Claimant's impairments prevent Claimant from performing the duties of a "Transporter, Patients" as that job is generally conducted in the national economy. As generally performed, that job involves medium duty, and, for the reasons previously discussed, the ALJ did not err in concluding that Claimant could engage in medium duty activity.

## VI.  CONCLUSION & RECOMMENDATION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that Plaintiff's

Motion for Summary Judgment [D.E. 11] be **DENIED**, that Defendant's Motion for Summary Judgment [D.E. 17] be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William P. Dimitrouleas, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal the factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc*); 28 U.S.C. § 636(b)(1).

**ORDERED AND ADJUDGED** at Fort Lauderdale, Florida, this 16st day of January, 2009.

ROBIN S. ROSENBAUM
United States Magistrate Judge

cc:     Honorable William P. Dimitrouleas
        Counsel of Record